## APPEAL OF BURKE ELECTRIC CO.

### Docket No. 1697.   Decided November 16, 1926.

1. PATENTS AND GOOD WILL.—The value of patents and good will acquired for stock at the time of organization determined on the basis of stipulation between parties.

2. PAID-IN SURPLUS.—A paid-in surplus, resulting from the acquirement from its stockholders of the stock of another corporation, and this resulting in an affiliation of the two companies, cannot affect invested capital of the affiliated group.

3. TAXES OF 1916.—Income taxes paid for a period ended in 1916 may properly reduce invested capital for 1917 in accordance with Bureau regulations and section 1207 of the Revenue Act of 1926.

4. CAPITAL VALUE OF PATENTS, MARCH 1, 1913.—The capital value of patents and inventions owned by the petitioner on March 1, 1913, determined from a consideration of profits produced prior to that time, opinion evidence and a comparison with profits produced subsequent thereto.

5. EXHAUSTION OF PATENTS, DEDUCTION.—In a proceeding before this Board a petitioner may claim and be allowed a deduction for the exhaustion of capital value of patents although the same was not made in its original return for the taxable year under consideration. Following *Union Metal Mfg. Co.*, 1 B. T. A. 395.

*Edward B. Burling, Esq.*, for the petitioner.
*J. Harry Byrne, Esq.*, for the Commissioner.

Under date of November 28, 1924, the Commissioner served upon the Burke Electric Co., of Erie, Pa., notice of a deficiency in income and profits taxes for the fiscal year ended April 30, 1917, in the amount of $5,755.05. From this notice the petitioner appealed, and the issues presented for determination are:

1. Value of patents acquired for stock on May 1, 1906.
2. Value of good will acquired for stock on May 1, 1906.

3. Whether in 1916 upon the acquirement of stock of the Duntley Products Co. the petitioner acquired a paid-in surplus.

4. Whether the amount of income taxes paid for the fiscal year ended April 30, 1916, are properly deducted from invested capital for the period ended April 30, 1917.

5. Value of patents owned by the petitioner on March 1, 1913.

6. Whether the petitioner may now claim a deduction based upon the exhaustion of patent values which was not claimed in its original income-tax return.

### FINDINGS OF FACT.

Petitioner is a Pennsylvania corporation with its principal office at Erie. It was organized on or about May 1, 1906, with an authorized capital stock of $1,250,000 par value—consisting of 2,500 shares of preferred and 10,000 shares of common, shares of both classes having a par value of $100 each—for the purpose of engaging in the business of manufacturing and selling electrical devices, machinery and equipment.

The original Burke Electric Co. was organized early in 1904, under the laws of the State of New Jersey, for the purpose of taking over and exploiting certain patents then owned by James Burke. In the middle of 1904 this company leased the plant of the Keystone Electric Co. and operated said plant until on or about May 1, 1906. During the period of operation of this leased plant the company's earnings were not sufficient to provide a return of 8 per cent on the tangible assets.

The Keystone Electric Co. had been organized some time prior to the original Burke Electric Co. and was engaged in manufacturing and selling electrical devices, machinery and equipment at its plant in Erie, Pa., until at or about the middle of 1904, when it leased its plant to the original Burke Electric Co. The business was not a success. The company's earnings were not sufficient to provide a return of 8 per cent on the tangible assets, and at the time of leasing its plant it was experiencing serious financial difficulties.

On May 1, 1906, the petitioner acquired all the assets and business of the Burke Electric Co. of New Jersey, hereinafter referred to as the New Jersey Company, for $642,000 par value of its own common capital stock. Among the assets thus acquired were tangible assets of a cash value of $30,000, good will, patents, and patent applications. The serial numbers of the patents, the dates the patents were issued, and the remaining life of the patents from the date acquired by the petitioner are set out as follows:

PATENTS.

| Patent No. | Date issued. | Remaining life. |
|---|---|---|
| | | *Years.* |
| 653945 | July 17, 1900 | 11. 2137 |
| 684188 | Oct. 8, 1901 | 12. 4411 |
| 706017 | Aug. 5, 1902 | 13. 2630 |
| 712257 | Oct. 28, 1902 | 13. 4932 |
| 768843 | Aug. 30, 1904 | 15. 3315 |
| 784032 | Mar. 7, 1905 | 15. 8493 |
| 784102 | Mar. 7, 1905 | 15. 8493 |
| 784103 | Mar. 7, 1905 | 15. 8493 |

The average remaining life of the above patents at the date acquired by the petitioner was 14.1613 years.

Prior to the beginning of the taxable year under consideration, three of the eight patents acquired from the New Jersey Company, to wit, Nos. 706,017, 712,257, and 768,843, had been disposed of in some manner by the petitioner.

The patent applications acquired from the New Jersey Company, the serial numbers of the patents issued, the dates applied for, and the dates the patents were issued, are set out below:

PATENT APPLICATIONS.

| Patent No | Date applied for. | Date issued. |
|---|---|---|
| 909,057 | Jan. 20, 1905 | Jan. 5, 1909 |
| 913,691 | May 17, 1905 | Mar. 2, 1909 |
| 976,115 | Nov. 2, 1905 | Nov. 15, 1910 |
| 1,026,904 | Mar. 14, 1906 | May 21, 1912 |

Likewise, on May 1, 1906, the petitioner acquired all the assets and business of the Keystone Electric Co. hereinafter referred to as the Keystone Company, for $358,000 par value of its own common capital stock. Among the assets thus acquired were tangible assets of a cash value of $139,856.53, good will, and patents. The serial numbers of the patents, the dates the patents were issued, and the remaining life of the patents from the date acquired by the petitioner, are set out below:

PATENTS.

| Patent No | Date issued. | Remaining life. |
|---|---|---|
| | | *Years.* |
| 415487 | Nov. 19, 1889 | 0. 5534 |
| 470158 | Mar. 1, 1892 | 2. 8329 |
| 510596 | Dec. 12, 1893 | 4. 6164 |
| 513626 | Jan. 30, 1894 | 4. 7507 |
| 562179 | June 16, 1896 | 7. 1260 |
| 608711 | Aug. 9, 1896 | 7. 2740 |
| 728975 | May 26, 1903 | 14. 0685 |
| 728976 | May 26, 1903 | 14. 0685 |
| 736667 | Aug. 18, 1903 | 14. 2986 |

The average remaining life of the above patents at the date acquired by the petitioner was 7.7321 years.

Prior to the beginning of the taxable year under consideration, six of the nine patents acquired from the Keystone Company, to wit, Nos. 415,487, 470,158, 510,596, 513,626, 562,179, and 608,711, had expired, and the other three patents had been disposed of in some manner by the petitioner.

Upon acquisition of the above-enumerated properties from the New Jersey Company and the Keystone Company, they were recorded on the books of the petitioner in the following amounts:

| | |
|---|---:|
| Tangible assets | $169,856.53 |
| Patents and good will | 830,143.47 |
| Total assets acquired | 1,000,000.00 |

The corresponding credit entry was made to common capital stock.

All of the petitioner's preferred capital stock, consisting of 2,500 shares of the par value of $100 each, was sold on or about the date of organization for cash at par.

In or about the month of November, 1906, a date approximately six months after the organization of the petitioner, James Burke, president of petitioner, entered into negotiations with George Westinghouse, president of the Westinghouse Electric & Manufacturing Co., with a view to the purchase by the latter individual and the Westinghouse Company of the petitioner's entire outstanding common and preferred capital stock. It appears that at the outset of the negotiations both parties met on the proposition that the preferred stock was to be paid for at par. Burke offered to sell the common stock at $75 per share, but Westinghouse offered $60 per share. In the final conference a compromise figure of $65 per share for the common was fixed.

Under the arrangement for the sale and purchase of this stock, the Westinghouse Company was to pay the purchase price in cash on or before the expiration of 10 years from the date of the contract, and in the interim was to pay dividends of 6 per cent and 4 per cent, respectively, on the preferred and common stock.

For some reason not entirely clear from the record, Burke rejected the final offer of Westinghouse, which was as stated above, and refused to carry on negotiations any further.

At the time of the negotiations above referred to, the tangible assets of the petitioner were approximately of the value of $433,937.28, comprising the original assets acquired from the New Jersey and Keystone companies of a value of $169,856.53, cash paid in for preferred stock in the amount of $250,000, and earnings of approximately $14,080.75.

The petitioner's net earnings, before any deduction for exhaustion of patents, and tangible assets for each year from the date of organization to and including the year 1920, were as follows:

| Year. | Net earnings. | Tangibles. | Year | Net earnings. | Tangibles. |
|---|---|---|---|---|---|
| 1907 | $33,793.80 | $163,534.86 | 1914 | $78,057.71 | $713,148.04 |
| 1908 | 2,045.80 | 431,270.91 | 1915 | 46,924.06 | 747,839.07 |
| 1909 | 10,833.26 | 416,701.91 | 1916 | 124,038.39 | 750,224.48 |
| 1910 | 123,051.54 | 411,859.47 | 1917 | 213,832.63 | 828,625.67 |
| 1911 | 176,127.43 | 508,013.86 | 1918 | 143,110.74 | 1,088,417.27 |
| 1912 | 59,732.44 | 616,377.89 | 1919 | 238,814.43 | 1,317,425.68 |
| 1913 | 83,156.17 | 627,472.17 | 1920 | 284,979.50 | 1,523,330.29 |

The Commissioner held that the good will acquired from the New Jersey and Keystone companies had an aggregate cash value at the date of acquisition of $332,322, and that the patents and patent applications acquired from the same companies had an aggregate cash value at the date of acquisition of $80,654.26. In the computation of petitioner's invested capital for the taxable year under consideration, the Commissioner included good will, acquired at organization, in the amount of $249,600, said amount being the 20 per cent limitation applicable to intangibles under the provisions of section 207(b) of the Revenue Act of 1917, and patents and patent applications, acquired at organization, at a value of $80,654.26.

The petitioner contends that the aggregate actual cash value of the good will, patents, and patent applications, acquired from the New Jersey and Keystone companies, was $480,143.47 at the date of acquisition, of which amount not more than 10 per cent represented the value of the good will. The petitioner further contends that, since the actual cash value, at the date of acquisition, of the good will thus acquired is less than the 20 per cent limitation imposed by section 207(b) of the Revenue Act of 1917, it is entitled to include the good will, patents, and patent applications acquired from the New Jersey and Keystone companies in the invested capital of the taxable year at an aggregate value of $480,143.47 in lieu of the total value of $330,254.26 which the Commissioner allowed for invested capital purposes.

The aggregate cash value, at the date of acquisition, of the good will, patents, and patent applications acquired from the New Jersey and Keystone companies was $412,976.26, of which amount $41,297.63 represents the value of the good will and $371,678.63 represents the value of the patents and patent applications.

On March 1, 1913, the petitioner was the owner of patent No. 1,053,940, issued February 18, 1913, and which had on March 1, 1913, a remaining life of 16-96/100 years. It was also the owner of

17 other patents, bearing numbers and dates of issue, and having a remaining life, as set forth below:

| Patent No. | Date issued. | Period of time to run after Mar. 1, 1913. | | |
|---|---|---|---|---|
| | | Years. | Months. | Days. |
| 653945 | July 17, 1900 | 4 | 4 | 16 |
| 684188 | Oct. 8, 1901 | 5 | 7 | 7 |
| 784032 | Mar. 7, 1905 | 9 | 0 | 6 |
| 784102 | Mar. 7, 1905 | 9 | 0 | 6 |
| 784103 | Mar. 7, 1905 | 9 | 0 | 6 |
| 909057 | Jan. 5, 1909 | 12 | 10 | 4 |
| 913691 | Mar. 2, 1909 | 13 | 0 | 1 |
| 976115 | Nov. 15, 1910 | 14 | 8 | 14 |
| 1026904 | May 21, 1912 | 16 | 2 | 20 |
| 1014001 | Jan. 9, 1912 | 15 | 10 | 8 |
| 979375 | Dec. 20, 1910 | 14 | 9 | 19 |
| 1033379 | July 23, 1912 | 16 | 4 | 22 |
| 893979 | July 21, 1908 | 12 | 4 | 20 |
| 987044 | Mar. 14, 1911 | 15 | 0 | 13 |
| 979143 | Dec. 20, 1910 | 14 | 9 | 19 |
| 1017132 | Feb. 13, 1912 | 15 | 11 | 12 |
| 92038 (Canada) | Mar. 7, 1905 | 9 | 0 | 6 |
| Total | | 201 | 78 | 199 |
| Averaging remaining life | | 12 | 2 | 25. 82 |

The nine patents issued subsequent to March 1, 1913, under applications pending on that date, are as follows:

| Number. | Date applied for. | Date issued. |
|---|---|---|
| 1061251 | Dec. 21, 1906 | May 6, 1913 |
| 1062383 | June 13, 1907 | May 27, 1913 |
| 1072422 | Oct. 9, 1907 | Sept. 9, 1913 |
| 1073662 | Sept. 20, 1907 | Sept. 23, 1913 |
| 1082459 | Dec. 10, 1910 | Dec. 23, 1913 |
| 1119815 | Sept. 18, 1907 | Dec. 8, 1914 |
| 1145551 | Dec. 10, 1910 | July 6, 1915 |
| 1185366 | Oct. 9, 1907 | May 30, 1916 |
| 117775 (Canada) | Sept. 14, 1907 | Nov. 17, 1914 |

The one patent applied for and issued subsequent to March 1, 1913, is the Cuban patent No. 2725, issued April 19, 1917.

During the period from 1906 to April 30, 1913, the petitioner employed in its manufacturing business average tangible assets and produced earnings as follows:

| Year ended April 30— | Earnings. | Average tangible investment. |
|---|---|---|
| 1907 | $33,793.80 | $297,402.88 |
| 1908 | 2,045.80 | 423,986.41 |
| 1909 | 10,833.26 | 414,280.70 |
| 1910 | 123,051.54 | 459,945.16 |
| 1911 | 136,127.43 | 562,204.37 |
| 1912 | 59,732.44 | 631,925.03 |
| 1913 | 83,166.17 | 680,310.10 |
| Total | 448,750.44 | 3,470,054.65 |
| Average | 64,107.21 | 495,722.09 |

During the years 1914 to 1921, inclusive, it employed in its business average tangible assets and produced earnings as follows:

| Year ended April 30— | Earnings. | Average tangible investment. |
|---|---|---|
| 1914 | $78, 057. 71 | $730, 493. 55 |
| 1915 | 46, 924. 06 | 749, 031. 77 |
| 1916 | 124, 038. 39 | 780, 425. 07 |
| 1917 | 213, 832. 63 | 958, 521. 47 |
| 1918 | 143, 110. 74 | 1, 202, 921. 48 |
| 1919 | 238, 814. 43 | 1, 420, 378. 04 |
| 1920 | 284, 979. 50 | 1, 627, 531. 17 |
| 1921 | 289, 251. 38 | 1, 835, 990. 77 |
| Total | 1, 419, 008. 84 | 9, 314, 293. 32 |
| Average | 177, 376. 10 | 1, 164, 286. 66 |

In the computation of its net income in the original return which it filed for the fiscal year under consideration, petitioner did not claim a deduction for exhaustion of patents. Subsequently, it filed an amended return for that year in which it claimed such a deduction in the amount of $76,770.91, based upon a March 1, 1913, value for its patents of $1,172,495.92. The Commissioner refused to allow the deduction claimed in the amended return on the ground that the petitioner, in failing to claim a deduction for exhaustion of patents in its original return, exercised an option not to claim such a deduction, which was thereafter binding upon it with respect to this particular year.

The Commissioner has reduced the petitioner's invested capital for the year under consideration by the amount of $1,435.57, representing the income tax for the preceding taxable year, prorated from the date such tax became due and payable.

Prior to 1912 the petitioner had been furnishing motors for electric vacuum cleaners to the Duntley Manufacturing Co., a corporation domiciled in Chicago. By 1912 conditions had developed with respect to the financial resources of the Duntley Manufacturing Co. which made it extremely doubtful whether that company could continue to operate and liquidate its indebtedness to the petitioner. For the purpose of alleviating this situation and working out a plan to save the Duntley Manufacturing Co. from the necessity of passing through a receivership, James Burke, president of the petitioner, and Van Cleave, one of petitioner's directors, undertook a thorough study of the situation, and finally offered a plan which provided for the organization of a new manufacturing company, known as the Duntley Products Co., leaving the Duntley Manufacturing Co. to continue as a selling company only. Burke and Van Cleave contracted to furnish to the Duntley Manufacturing Co. such funds as were necessary to correct its financial difficulties, that com-

pany in turn to assign to Burke and Van Cleave its right under a license agreement to manufacture electric vacuum cleaners, under the so-called Kinney patent which gave to its owners a virtual monopoly in the manufacture of vacuum cleaners. The whole plan was adopted precisely as outlined.

Upon organization of the Duntley Products Co., Burke and Van Cleave assigned to it their contract with the Duntley Manufacturing Co., receiving in exchange therefor the entire authorized common capital stock of a par value of $50,000. The entire authorized preferred stock of $25,000 par value was sold for cash. The preferred stock certificates contained a provision for their redemption on the basis of $105 per share.

During the period from organization to the time of the sale of its capital stock to the petitioner the average earnings of the Duntley Products Co. were approximately $5,400 per year, an amount equivalent to a return of approximately 7.2 per cent on its entire outstanding capital stock.

In 1916 the entire capital stock, common and preferred, of the Duntley Products Co. was sold to the petitioner for a price of $26,250 cash, which was equivalent to the redemption price of the preferred stock. At the time of the sale Burke and Van Cleave, both of whom are large stockholders of the petitioner, owned all of the common stock of the Duntley Products Co.

The Duntley Products Co. operated until some time in the year 1919. However, during the period subsequent to the stock transaction in 1916, its business was seriously hampered and restricted by governmental regulations incidental to the World War, the business having been classified as a non-essential. Such vacuum cleaners as were sold during the period of the war were assembled almost entirely from parts manufactured prior to the war. Because of these regulatory restrictions the business was unable to progress in a normal manner during the period of the war, and the year 1919 found the business in much the same situation as existed late in 1916 and early in 1917.

Notwithstanding the difficulties under which it had been laboring and its retarded progress because of governmental regulations, the business and assets of the Duntley Products Co. were sold in 1919 at a price of approximately $66,250, which was sufficient to liquidate its preferred stock at $105 per share, and left approximately $40,000 wherewith to liquidate its common stock of a par value of $50,000.

The petitioner appraised the capital stock of the Duntley Products Co. which it had acquired for $26 250 cash at a value of $70,-603.45, and in its computation of invested capital in the return for the year under consideration included therein a paid-in surplus equal to the excess of the appraised value over and above the cost

of the stock, to wit, $44,353.45. The paid-in surplus claimed was disallowed by the Commissioner.

The Commissioner has held that the petitioner and the Duntley Products Co. were affiliated during the taxable year 1917 and has computed the excess-profits tax upon the basis of such a consolidation.

OPINION.

TRUSSELL: 1 and 2. The first issue presented by this appeal involves a determination of the actual cash value, at the date of acquisition, of the patents, patent applications, and good will, acquired from the Burke Electric Co. (New Jersey) and the Keystone Electric Co., and the extent to which such assets may be included in the invested capital for the taxable year under consideration.

The Commissioner has fixed the value of the combined good will of the two predecessor companies at $332,322, and has included the same in the invested capital to the extent of $249,600, the latter amount being the 20 per cent limitation applicable to intangibles imposed by section 207(b) of the Revenue Act of 1917. The Commissioner also has fixed the value of the combined patents and patent applications acquired from the same companies at $80,654.26, and has included the full amount thereof in invested capital. Thus the full amount which the Commissioner has included in invested capital on account of the intangible properties acquired from the predecessor companies is $330,254.26. For these properties the petitioner had issued capital stock in the sum of $830,143.47.

On the other hand, the petitioner contends that the actual cash value of these properties was $480,143.47, and that not more than 10 per cent of this value was attributable to the good will of the predecessor companies. So, if the petitioner's contentions in this respect are sustained, the result will be an increase in invested capital, over that allowed by the Commissioner, of $149,889.21.

The value of $480,143.47 for the intangible properties acquired from its predecessors, for which the petitioner is contending, is predicated upon a total value of $900,000 for the capital stock which is issued for all the assets of its predecessors, and this capital stock value is in turn predicated upon the compromise offer of George Westinghouse for the purchase of petitioner's entire outstanding capital stock during his unsuccessful negotiations with James Burke in November, 1906, approximately six months after the petitioner was organized. Counsel for both parties entered into a stipulation that the combined value of the net tangible assets acquired from the two predecessor companies is $169,856.53. By adding to this amount the proceeds of $250,000 realized from the sale of preferred stock

and deducting the result of $419,856.53 from Westinghouse's offer of $900,000, the petitioner arrives at a value of $480,143.47 for the capital stock issued for the intangible properties. Hence, so far as the combined value of the intangible properties is concerned, there is a difference of but $67,167.21 between the petitioner and the Commissioner.

Counsel for both parties entered into a stipulation that the combined value of the intangible properties acquired from the two predecessor companies, at the date of acquisition, was at least $412,976.26; and when we consider the financial history of these two companies, as well as that of the petitioner subsequent to organization, we feel that this amount represents the maximum value of the intangibles at the date of acquisition. The difference between this value for the intangibles and that predicated upon the offer of Westinghouse, we feel, may fairly be attributed to development subsequent to the acquisition of these properties. It was then, for the first time, that their earning power was demonstrated. Prior to that time there had been no such demonstration. The operations of the Keystone Company had proved a failure, while the New Jersey Company had not as yet undertaken to venture into the field of commerce and trade. The earnings of the petitioner for the first year after organization were in excess of $30,000, a nominal return on its outstanding capital stock, it is true, but a vast improvement over the results obtained by its two predecessors.

Having reached a combined value of $412,976.26 for the patents, patent applications and good will acquired from the two predecessors, the next problem confronting us is the segregation of such value between good will and patents. Such a segregation is necessary under section 207 of the Revenue Act of 1917, since the good will value is subject to the 20 per cent limitation imposed by the proviso to subdivision (a) of that section and patents are not. Of the total combined value the Commissioner assigns $332,322 to good will and $80,654.26 to the patents and patent applications. A consideration of all the facts outlined in our findings of fact which have a bearing upon the intangible values, and the facts which we have commented upon in the preceding paragraph, convinces us that the reverse of the Commissioner's assignment of values would more accurately reflect the real situation. Out of a combined value of $412,976.26, the assignment of a value of $332,322 to good will is not justified by the facts in this case. Indeed, when we consider the fact that the operations of the Keystone Company resulted in such a total failure that the petitioner contemplated the abandonment of most of its line of products and undertook to rid itself entirely of the name of, and of any other resemblance to, the Keystone Company, and that the New

Jersey Company had not at the time established a market for its products, the utter fallacy of the Commissioner's segregation of intangible values is readily apparent.

James Burke, president of the petitioner, expressed an opinion on the witness stand that the value of the good will acquired from the two predecessor companies did not exceed 10 per cent of the total value of the intangibles. On the facts developed in this case, we are convinced that such was the situation, and we subscribe to that opinion as fully confirmed by the evidence.

In view of the foregoing, we conclude that a fair segregation of the total value of $412,976.26 for the assets hereinbefore mentioned results from the assignment of a value of $371,678.63 to the patents and patent applications and of $41,297.63 to the good will, and that the values so assigned represent the actual cash values of the respective properties at the date of their acquisition.

3. The third issue raised by the pleadings in this appeal relates to a question of the fair market value, at the date of acquisition, of the entire outstanding capital stock of the Duntley Products Co. acquired by this petitioner for cash and by gift from its stockholders, and the extent to which such value may be included in invested capital.

It is apparent to us from the facts in this case that the capital stock of the Duntley Products Co. had a value at the date acquired by this petitioner in excess of the amount paid therefor and that such value was $66,250, or $40,000 in excess of the consideration paid by the petitioner. It appears, however, that upon this petitioner's acquiring the stock of the Duntley Products Co. that company became affiliated with the petitioner and so continued until the year 1919; that the Commissioner has allowed the petitioner and the Duntley Products Co. to make a consolidated return for the year here in question, and, therefore, for invested capital purposes, it matters not at what figure the Duntley Products Co.'s stock is carried on the books of the petitioner, and any change in the book value of such stock can have no effect upon the invested capital of the consolidated group for the year in question.

4. The elimination of $1,435.57, on account of income taxes paid for the period ending April 30, 1916, from invested capital for the fiscal year ended April 30, 1917, appears to have been made by the Commissioner in accordance with the regulations of the Treasury Department, and in view of section 1207 of the Revenue Act of 1926 and our decision in the *Appeal of Russel Wheel & Foundry Co.*, 3 B. T. A. 1168, the Commissioner's action can not now be modified.

5. On March 1, 1913, this petitioner was the owner of eighteen patents relating to machinery and devices connected with the use

of electricity as motive power. It also owned at the same time nine specific inventions of other like machines and devices which were on that date protected by applications for patent, upon which applications patents were thereafter issued. It is the contention of the petitioner that all of these patents and inventions had on March 1, 1913, a capital value subject to the allowance of a deduction for exhaustion in accordance with the provisions of the several revenue acts.

For the purpose of considering this matter, it appears that the petitioner's patents may be taken as falling into two groups, and that in the first group there should be included seventeen of the patents, the individual character of which is not here important, and in the second group the one patent, No. 1,053,940, covering a device known as the "Universal Motor." This last patent was issued on February 18, 1913, and therefore on March 1, 1913, was only 11 days old. The group of seventeen patents had on March 1, 1913, an average remaining life of 12 years, 2 months, and 25 days. These patents, together with the nine inventions still pending under applications for patents, had been the basis of the petitioner's business from the time of its organization in 1906. The petitioner's manufacturing business during those years had been devoted exclusively to the manufacture of machines and devices covered by these patents and inventions, and whatever income and profits the petitioner's business had produced was in a large measure the product of the exploitation of these patents and inventions.

In view of the history of these patents and inventions, the earnings and profits produced by their use in business, and in the light of subsequent profits from 1914 to 1921, inclusive, we are of the opinion that the above-mentioned group of seventeen patents, together with the nine inventions covered by applications for patents, had on March 1, 1913, a capital value of $220,000.

The one patent covering the device known as the "Universal Motor" is, we believe, of such a character as to require specific consideration. The testimony of the inventor and other patent experts convinces us that this device is so thoroughly basic in character as to be almost revolutionary in the business of producing electric motors, and that it therefore has a value all its own. On March 1, 1913, the invention was complete, the patent had been issued, and the petitioner was ready to apply it to its manufacturing business. Its true capital value was then a fact, although men might differ as to the amount of that value. The testimony of the inventor shows that he then believed this patent had a value of more than $600,000, while other witnesses thoroughly familiar not only with this patent but with others testified that in their opinion this patent had a value of more than $1,000,000. The record of this appeal

shows the history of this patent from the date of issue to April 30, 1921. This petitioner began at once to produce electric motors covered by this patent and at the same time many of its competitors immediately began to produce similar articles; this action produced a period of litigation involving the validity of the patents and such litigation continued over the first three years of the life of the patent. When the suits growing out of the infringement of this patent had 'finally been determined in favor of this petitioner, it first entered upon the successful exploitation of this patent, and the results obtained during the years 1917 to 1921, inclusive, have been placed in the record as evidence in support of the values which the inventor and his associates placed upon the patent at the time it was first issued. We have examined this evidence and, in view of all the facts, we have arrived at the conclusion that on March 1, 1913, this patent, No. 1,053,940, had a capital value of $440,000.

6. Following the rule laid down in the *Appeal of Union Metal Mfg. Co.*, 1 B. T. A. 395, the petitioner may now properly claim a deduction from gross income on account of the cost of the capital value of patents although not claimed in its original return.

> *Order of redetermination in accordance with the foregoing findings of fact and opinion will be entered on 15 days' notice, pursuant to Rule 50.*

TRAMMELL dissents.