*561 OPINION.
Tkussell:
1 and 2. The first issue presented by this appeal involves a determination of the actual cash value, at the date of acquisition, of the patents, patent applications, and good will, acquired from the Burke Electric Co. (New Jersey) and the Keystone Electric Co., and the extent to which such assets may be included in the invested capital for the taxable year under consideration.
The Commissioner has fixed the value of the combined good will of the two predecessor companies at $332,322, and has included the same in the invested capital to the extent of $249,600, the latter amount being the 20 per cent limitation applicable to intangibles imposed by section 207(b) of the Eevenue Act of 1917. The Commissioner also has fixed the value of the combined patents and patent applications acquired from the same companies at $80,654.26, and has included the full amount thereof in invested capital. Thus the full amount which the Commissioner has included in invested capital on account of the intangible properties acquired from the predecessor companies is $330,254.26. For these properties the petitioner had issued capital stock in the sum of $830,143.47.
On the other hand, the petitioner contends that the actual cash value of these properties was $480,143.47, and that not more than 10 per cent of this value was attributable to the good will of the predecessor companies. So, if the petitioner’s contentions in this respect are sustained, the result ivill be an increase in invested capital, over that allowed by the Commissioner, of $149,889.21.
The value of $480,143.47 for the intangible properties acquired from its predecessors, for which the petitioner is contending, is predicated upon a total value of $900,000 for the capital stock which is issued for all the assets of its predecessors, and this capital stock value is in turn predicated upon the compromise offer of George Westinghouse for the purchase of petitioner’s entire outstanding capital stock during his unsuccessful negotiations with James Burke in November, 1906, approximately six months after the petitioner was organized. Counsel for both parties entered into a stipulation that the combined value of the net tangible assets acquired from the two predecessor companies is $169,856.53. By adding to this amount the proceeds of $250,000 realized from the sale of preferred stock *562 and deducting the result of $419,856.58 from Westinghouse’s offer of $900,000, the petitioner arrives at a value of $480,143.47 for the capital stock issued for the intangible properties. Hence, so far as the combined value of the intangible properties is concerned, there is a difference of but $67,167.21 between the petitioner and the Commissioner.
Counsel for both parties entered into a stipulation that the combined value of the intangible properties acquired from the two predecessor companies, at the date of acquisition, was at least $412,976.26; and when we consider the financial history of these two companies, as well as that of the petitioner subsequent to organization, we feel that this amount represents the maximum value of the intangibles at the date of acquisition. The difference between this value for the intangibles and that predicated upon the offer of Westinghouse, we feel, may fairly be attributed to development subsequent to the acquisition of these properties. It was then, for the first time, that their earning power was demonstrated. Prior to that time there had been no such demonstration. The operations of the Keystone Company had proved a failure, while the New Jersey' Company had not as yet undertaken to venture into the field of commerce and trade. The earnings of the petitioner for the first year after organization were in excess of $30,000, a nominal return on its outstanding capital stock, it is true, but a vast improvement over the results obtained by its two predecessors.
Having reached a combined value of $412,976.26 for the patents, patent applications and good will acquired from the two predecessors, the next problem confronting us is the segregation of such value between good will and patents. Such a segregation is necessary under section 207 of the Revenue Act of 1917, since the good will value is subject to the 20 per cent limitation imposed by the proviso to subdivision (a) of that section and patents are not. O'f the total combined value the Commissioner assigns $332,322 to good will and $80,654.26 to the patents and patent applications. A consideration of all the facts outlined in our findings of fact which have a bearing upon the intangible values, and the facts which we have commented upon in the preceding paragraph, convinces us that the reverse of the Commissioner’s assignment of values would more accurately reflect the real situation. Out of a combined value of $412,976.26, the assignment of a value of $332,322 to good will is not justified by the facts in this case. Indeed, when we consider the fact that the operations of the Keystone Company resulted in such a total failure that the petitioner contemplated the abandonment of most of its line of products and undertook to rid itself entirely of the name of, and of any other resemblance to, the Keystone Company, and that the New *563 Jersey Company had not at the time established a market for its products, the utter fallacy of the Commissioner’s segregation of intangible values is readily apparent.
James Burke, president of the petitioner, expressed an opinion on the witness stand that the value of the good will acquired from the two predecessor companies did not exceed 10 per cent of the total value of the intangibles. On the facts developed in this case, we are convinced that such was the situation, and we subscribe to that opinion as fully confirmed by the evidence.
In view of the foregoing, we conclude that a fair segregation of the total value of $412,976.26 for the assets hereinbefore mentioned results from the assignment of a value of $371,678.63 to the patents and patent applications and of $41,297.63 to the good will, and that the values so assigned represent the actual cash values of the respective properties at the date of their acquisition.
3. The third issue raised by the pleadings in this appeal relates to a question of the fair market value, at the date of acquisition, of the entire outstanding capital stock of the Duntley Products Co. acquired by this petitioner for cash and by gift from its stockholders, and the extent to which such value may be included in invested capital.
It is apparent to us from the facts in this case that the capital stock of the Duntley Products Co. had a value at the date acquired by this petitioner in excess of the amount paid therefor and that such value was $66,250, or $40,000 in excess of the consideration paid by the petitioner. It appears, however, that upon this petitioner’s acquiring the stock of the Duntley Products Co. that company became affiliated with the petitioner and so continued until the year 1919; that the Commissioner has allowed the petitioner and the Duntley Products Co. to make a consolidated return for the year here in question, and, therefore, for invested capital purposes, it matters not at what figure the Duntley Products Co.’s stock is carried on the books of the petitioner, and any change in the book value of such stock can have no effect upon the invested capital of the consolidated group for the year in question.
4. The elimination of $1,435.57, on account of income taxes paid for the period ending April 30, 1916, from invested capital for the fiscal year ended April 30, 1917, appears to have been made by the Commissioner in accordance with the regulations of the Treasury Department, and in view of section 1207 of the Bevenue Act of 1926 and our decision in the Appeal of Russel Wheel & Foundry Co., 3 B. T. A. 1168, the Commissioner’s action can not now be modified.
5. On March 1, 1913, this petitioner was the owner of eighteen patents relating to machinery and devices connected with the use *564 of electricity as motive power. It also owned at the same time nine specific inventions of other like machines and devices which were on that date protected by applications for patent, upon which applications patents were thereafter issued. It is the contention of the petitioner that all of these patents and inventions had on March 1, 1913, a capital value subject to the allowance of a deduction for exhaustion in accordance with the provisions of the several revenue acts.
For the purpose of considering this matter, it appears that the petitioner’s patents may be taken as falling into two groups, and that in the first group there should be included seventeen of the patents, the individual character of which is not here important, and in the second group the one patent, No. 1,053,940, covering a device known as the “ Universal Motor.” This last patent was issued on February 18, 1913, and therefore on March 1, 1913, was only 11 days old. The group of seventeen patents had on March 1, 1913, an average remaining life of 12 years, 2 months, and 25 days. These patents, together with the nine inventions still pending under applications for patents, had been the basis of the petitioner’s business from the time of its organization in 1906. The petitioner’s manufacturing business during those j^ears had been devoted exclusively to the manufacture of machines and devices covered by these patents and inventions, and whatever income and profits the petitioner’s business had produced was in a large measure the product of the exploitation of these patents and inventions.
In view of the history of these patents and inventions, the earnings and profits produced by their use in business, and in the light of subsequent profits from 1914 to 1921, inclusive, we are of the opinion that the above-mentioned group of seventeen patents, together with the nine inventions covered by applications for. patents, had on March 1, 1913, a capital value of $220,000.
The one patent covering the device known as the “ Universal Motor ” is, we believe, of such a character as to require specific consideration. The testimony of the inventor and other patent experts convinces us that this device is so thoroughly basic in character as to be almost revolutionary in the business of producing electric motors, and that it therefore has a value all its own. On March 1, 1913, the invention was complete, the patent had been issued, and the petitioner was ready to apply it to its manufacturing business. Its true capital value was then a fact, although men might differ as to the amount of that value. The testimony of the inventor shows that he then believed this patent had a value of more than $600,000, while other witnesses thoroughly familiar not only with this patent but with others testified that in their opinion this patent had a value of more than $1,000,000. The record of this appeal *565 shows the history of this patent from the date of issue to April 30, 1921. This petitioner began at once to produce electric motors covered by this patent and at the same time many of its competitors immediately began to produce similar articles; this action produced a period of litigation involving the validity of the patents and such litigation continued over the first three years of the life of the patent. When the suits growing out of the infringement of this patent had 'finally been determined in favor of this petitioner, it first entered upon the successful exploitation of this patent, and the results obtained during the years 1917 to 1921, inclusive, have been placed in the record as evidence in support of the values which the inventor and his associates placed upon the patent at the time it was first issued. We have examined this evidence and, in view of all the facts, we have arrived at the conclusion that on March 1, 1913, this patent, No. 1,053,940, had a capital value of $440,000.
6. Following the rule laid down in the Appeal of Union Metal Mfg. Go., 1 B. T. A. 395, the petitioner may now properly claim a deduction from gross income on account of the cost of the capital value of patents although not claimed in its original return.

Order of redetermination in accordance with the foregoing findings of fact and opinion will be entered on 15 days' notice, pursuant to Rule 50.

TRammell dissents.